IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

MADELINE NEWTON,                                                    Civ. No. 11-1029-AC

                  Plaintiff,                                     FINDINGS AND
                                                                    RECOMMENDATION

    v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                Defendant.

_____

ACOSTA, Magistrate Judge:

*Introduction*

    Claimant Madeline Newton ("Claimant") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act ("SSA").  *See* 42 U.S.C. §§ 401-433

(2010).  This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. §

405(g).  Following a careful review of the record, the court concludes that the Commissioner's

decision should be reversed and remanded for an award of benefits.

*Procedural History*

Claimant applied for DIB on May 4, 2007, alleging a disability onset date of October 1, 2004.

The claim was denied initially and upon reconsideration.  On October 2, 2009, a hearing was held

before an Administrative Law Judge ("ALJ"), who issued a decision on December 7, 2009, finding

Claimant not disabled at any time between her alleged onset date and September 30, 2005,

Claimant's date last insured.  Claimant requested review of that decision on February 9, 2010.  The

Appeals Council denied the request on June 30, 2011, making the ALJ's decision the final decision

of the Commissioner, subject to judicial review.  Claimant filed for judicial review in this court on

August 24, 2011.

*Factual Background*

On October 11, 2004, Claimant attended an appointment with her primary care physician,

Dr. Daniel Skotte ("Dr. Skotte"), complaining of a numb mouth that had begun the night before.  (Tr.

216.)  Dr. Skotte noted Claimant's right lip was drooping and that there was an obvious effect on her

right facial muscles.  Claimant's speech, however, was not obviously affected.  Dr. Skotte assessed

right facial neuropathy, and referred Claimant to Dr. Craigan Griffin ("Dr. Griffin") for a

neurological evaluation.

Claimant attended her initial consult with Dr. Griffin on October 13, 2004.  Among the

symptoms Dr. Griffin catalogued were facial weakness, numbness, and difficulty speaking.  (Tr.

286.)  Claimant's reflexes were absent or trace at best, but Claimant had full muscle strength, normal

muscle tone, and no abnormal or involuntary muscle movement.  (Tr. 288.)  Claimant's sensation

and movement had improved slightly in the two days since her visit to Dr. Skotte, and she denied any difficulty chewing, swallowing, or walking, and denied any vision problems. (Tr. 286.) Dr. Griffin found Claimant to be alert and a good historian. (Tr. 288.) At the end of the exam, Dr. Griffin ordered Claimant to undergo an MRI of her brain and neck. (Tr. 289.)

On October 22, 2004, Claimant followed up with Dr. Griffin, and reported that her facial symptoms had nearly resolved. However, the MRI performed on October 19, 2004, showed "a single moderate size left deep parietal white matter" in Claimant's brain. (Tr. 290.) This finding, suggestive of multiple sclerosis ("MS"), prompted Dr. Griffin to ask Claimant if she had any prior episodes of gait instability. (Tr. 290, 291.) Claimant responded that she has had "a [sic] episode of difficulty climbing stairs." (Tr. 290.) This prior episode of gait instability combined with the MRI reading led Dr. Griffin to diagnose Claimant with MS. (Tr. 291.) Dr. Griffin prescribed Avonex to begin Claimant's treatment program, and directed her to follow up with him in one month. (Tr. 291.)

Claimant returned to Dr. Griffin on November 23, 2004, complaining of blurry vision and large pupils on awakening, though her pupils were not noticeably dilated at the office visit. (Tr. 283.) Avonex was causing Claimant to experience moderate to severe headaches, achiness in her hands, hips, and neck, and fatigue the day after her injections. Dr. Griffin noted that all these symptoms are typical for Avonex, and that Claimant was tolerating the symptoms relatively well. Dr. Griffin directed Claimant to follow up with him in two to three months, unless her problems persisted. (Tr. 285.)

Claimant's next appointment with Dr. Griffin was on January 25, 2005. Despite Dr. Griffin's notation that symptoms from Claimant's Avonex injections had improved, Claimant complained that through the night and day after her injections, she continued to experience flu-like symptoms. (Tr.

279.) Claimant stated that she had been tripping on stairs at her home, but denied that this was a gait instability problem. However, in his notes, Dr. Griffin appeared to disregard this explanation, writing that Claimant had "ongoing gait instability." (Tr. 281.) Claimant did complain of excessive fatigue and trouble walking. (Tr. 280.) Furthermore, over the preceding two months, Claimant had experienced increasing difficulty with concentration. For example, Claimant had traditionally handled bookkeeping work for her husband's truck-driving business, but recently, she had needed her husband's assistance with this task because "she has not been competent in her ability to do this accurately." (Tr. 279.) Still, Dr. Griffin encouraged claimant to remain as active as possible and to return in three months. (Tr. 281.)

On March 10, 2005, Claimant visited Dr. Sara Charnecki[1] at La Pine Community Clinic. While reporting only occasional stumbling, Claimant also reported twisting her ankle regularly, only being able to sit for brief periods of time before getting numb, and continuing flu-like symptoms from her Avonex injections. Dr. Charnecki encouraged Claimant to return to work, but only on a part-time basis. (Tr. 243.)

Claimant followed up with Dr. Griffin on April 26, 2005. She complained of intermittent severe dizziness, increasing in frequency. This dizziness occurred especially when bending over, standing up too quickly, or moving her head from side-to-side. Claimant also experienced hypersensitivity to touch in her scalp, and intense headaches while reading. Additionally, Claimant continued to report fatigue after her Avonex injections: severe at first, but improving over the next

---

[1] Both the ALJ in her decision (Tr. 26), and counsel for the Commissioner in her reply (Def.'s Brief at 13) refer to Claimant's March 10, 2005, appointment as taking place with "Dr. Chernak." A fairly quick perusal of La Pine Community Clinic's submitted records indicates that all Claimant's treatment at that facility took place with Dr. *Charnecki*. (Tr. 242, 244-247, 249-250.) There is no mention of "Dr. Chernak."

day or two.  After only a few days of normal activities, however, Claimant was fatigued again.  Still, Dr. Griffin noted that Claimant was tolerating the flu-like symptoms immediately surrounding her injections better.  (Tr. 271.)  Between January and April, Claimant had fallen on two different occasions: once while in her yard, the other while climbing stairs.  Claimant denied dizziness, light-headedness, weakness or pain as triggers for the fall, but insisted she had simply "stumbled."  (Tr. 272.)  Nevertheless, Dr. Griffin noted gait instability and dizziness as impressions from the visit, cataloguing them along with headaches, blurred vision, and fatigue.  (Tr. 273-274.)  Dr. Griffin also recommended that Claimant avoid heated environments, "which would tend to exacerbate her symptoms."  (Tr. 275.)

Also on April 26, 2005, at Claimant's request, Dr. Griffin filled out a vocational rehabilitation form, outlining limitations on Claimant's abilities should she desire a return to the workplace.  Noting fatigue, gait imbalance, facial numbness, and blurred vision, Dr. Griffin also listed Claimant's poor endurance and poor balance as functional limitations on her workplace skills.  Furthermore, he described Claimant's prognosis as "uncertain" but trending in general towards "chronic progression."  (Tr. 368.)  In sum, Dr. Griffin essentially restricted Claimant to part-time work not involving heavy labor, situations where she could lose her balance, or heated environments, since heat would "tend to exacerbate her symptoms."  (Tr. 275.)  These restrictions, essentially limiting Claimant to sedentary labor, were reinforced by an unnamed reviewer for the State of Oregon's Office of Vocational Rehabilitation who, on June 1, 2005, explicitly recommended Claimant perform only sedentary work.[2]  That reviewer described Claimant's MS as a progressive

---

[2] The ALJ's decision attributes page one of Exhibit 12F (Tr. 367) to Dr. Griffin.  There is no evidentiary basis for such treatment.  The handwriting, signatures and dates on the two pages of Exhibit 12F are markedly different.  Accordingly, this court disregards the ALJ's analysis of page

disease, with remissions and exacerbations expected.  (Tr. 367.)

On June 9, 2005, Claimant returned to Dr. Charnecki due to illness possibly related to her "MS shot."  (Tr. 242.)  She complained of general flu-like symptoms, including dizziness, light-headedness, and severe headaches.  Claimant also mentioned that she was often overheated and that it was difficult to leave the house.  (Tr. 242.)  Claimant returned to Dr. Charnecki on August 18, 2005, for a physical and gynecological exam.  (Tr. 240.)  This is claimant's last medical record prior to her date last insured of September 30, 2005.

However, the ALJ's decision also discussed portions of Claimant's medical records after her date last insured.  On October 27, 2005, Claimant attended another scheduled follow-up with Dr. Griffin.  Claimant continued to complain of excessive fatigue, numbness, weakness, and coordination problems, particularly with her legs.  (Tr. 268.)  Though Claimant's chronic daily headaches were responding to over-the-counter medication, they did so only in response to increasing doses. (Tr. 269).  Claimant also stated she was having difficulty sleeping; however, she did not feel particularly sleepy during the daytime.  (Tr. 267.)  Dr. Griffin also noted that Claimant was attending tax school at H&R Block two days per week and continuing to do books for her husband's truck-driving enterprise.  (Tr. 268, 270.)

On November 15, 2005, Claimant began part-time work at H&R Block.  This employment ended on January 25, 2006.  (Tr. 125.)  On January 26, 2006, Claimant met with Dr. Michael Rosenfield ("Dr. Rosenfield") at La Pine Community Clinic.  Dr. Rosenfield noted flu-like symptoms, including coughing, congestion, body aches, and trouble sleeping, all dating to January

one as it relates to Dr. Griffin's opinion.  The court does, however, consider that page as evidence that corroborates Dr. Griffin's opinions.

9, 2006.  He also noted that Claimant had fallen "a couple of times" related to her MS, and was having difficulty administering Avonex shots by herself.  (Tr. 384.)  Claimant returned to Dr. Rosenfield on February 23, 2006, where they discussed the natural progression of Claimant's MS. (Tr. 383.)

Claimant returned to Dr. Griffin for a follow-up on April 10, 2006, with the doctor noting continuing symptoms of gait instability, blurred vision, and muscle cramps.  (Tr. 261.)  Dr. Griffin opined that Claimant's chronic daily headaches might be caused by Claimant's difficulty focusing her vision while reading, while noting that her headache symptoms had continued to improve.  (Tr. 263.)  Similarly, Claimant seemed to be tolerating Avonex treatment well.  However, Claimant complained about problems with insomnia, stating that she was only sleeping two hours per night. (Tr. 264.)  Dr. Griffin noted in an addendum that while Claimant had completed tax school, she had not passed the test required to actually do tax preparation work.  While Claimant wished to retake the test, Dr. Griffin recommended that she wait until her medical concerns stabilized.  (Tr. 264.)

Claimant returned to her primary care physician, Dr. Charnecki, on April 19, 2006, and April 26, 2006, for a regular thyroid check.  But at those appointments, Claimant reiterated her problems with insomnia and blurred vision.  (Tr. 380, 381.)  On May 1, 2006, Claimant again saw Dr. Griffin, who noted a comparative lessening of symptoms: Claimant's gait seemed fairly normal, her blurred vision stable, and that her episodes of paresthesias were not progressing.  (Tr. 258-259.)  While Claimant's balance was better some days than others, her balance problems were "not impairing function or leading to falls."  Dr. Griffin also noted Claimant's desire to return to work, and that she continued to do bookwork for her husband.  (Tr. 259.)

On May 1, 2006,[3] Claimant began work at Ray's Market, a deli, on a part-time basis, 25-30 hours per week.  On May 23, 2006, Claimant reported to Dr. Charnecki that she was having no difficulty sleeping, and that she planned to continue working.  (Tr. 378.)  However, Claimant left her job before the end of the month,[4] citing an inability to tolerate the heated environment around the ovens.  (Tr. 60.)

Claimant continued her Avonex treatments through the fall of 2006, when she discontinued medication due to its flu-like side effects.  (Tr. 252.)  Claimant's symptoms continued to worsen, and by May 25, 2007, when Claimant began treatment with Dr. Laura Schaben ("Dr. Schaben"), Claimant was suffering from depression, cognitive dysfunction, fatigue, vision problems, and gait abnormalities so severe that, in Dr. Schaben's opinion, she was clearly not employable.  (Tr. 255.)  Dr. Schaben also noted that Claimant was no longer able to assist her husband with financial issues related to his business.  (Tr. 252).

Between July and August 2007, Claimant followed up twice more with Dr. Schaben.  At both appointments, Dr. Schaben reviewed Claimant's history and noted her depression, heat intolerance, gait instability, headaches, fatigue, and blurry vision.  Generally, Dr. Schaben found that Claimant's symptoms were worsening.  (Tr. 361, 364.)  After her August 20, 2007, visit, Claimant did not visit Dr. Schaben for over a year.  In the interim, Claimant's family installed a railing in their home due

---

[3] On her Work Activity Report (Tr. 125), Claimant indicated that she began work at Ray's Market on May 1, 2005, leaving the job 20 days later.  However, on her Form 3368, Claimant indicated that her work at Ray's began in May of 2006.  This second date is validated by Claimant's Detailed Earnings Query (Tr. 113.)

[4] On her Work Activity Report (Tr. 125), Claimant noted that she left her job at the deli on May 20, 2006.  This is inconsistent with Claimant's statement to Dr. Charnecki on May 23 that she was still working.  There is, however, no question that Claimant left her job by the end of May.

to Claimant's difficulty balancing.  (Tr. 51.)  On September 4, 2008, Dr. Schaben noted that Claimant had discontinued using Avonex to treat her MS because Claimant was unable to tolerate the drug's side effects.  (Tr. 353.)  Dr. Schaben further observed that while there was no clear onset date for Claimant's vision problems and gait disorder, those issues had at least been present since 2006.  (Tr. 354.)

Claimant continued her treatment with Dr. Schaben through the remainder of 2008 and up to the date of her administrative hearing.  While Dr. Schaben continued to note that Claimant's gait disorder and vision problems had no clear onset date, her records also continued to reflect Dr. Griffin's diagnosis of gait instability since April of 2005.  (Tr. 340-341, 344-347, 349, 355.)  On October 9, 2009, Dr. Schaben submitted an opinion letter regarding Claimant's disability between her alleged onset date and her date last insured.  Dr. Schaben confirmed that Claimant suffered from fatigue, balance problems, poor coordination, depression, spasticity, heat sensitivity, pain, cognitive difficulties, emotional problems, oscillopsia, loss of manual dexterity, unstable walking, weakness, and numbness, all due to MS.  (Tr. 393.)  According to Dr. Schaben, these symptoms make it difficult to read, work on a computer, and walk around a room.  (Tr. 392.)  Dr. Schaben also laid out several work restrictions for Claimant that render any type of gainful work difficult or impossible. (Tr. 395.)  Finally, Dr. Schaben opined that because "there are past records documenting [Claimant's] longstanding disability," it was reasonable to conclude that Claimant was limited in similar ways prior to her date last insured.  (Tr. 396.)

Claimant testified at the administrative hearing, held on October 2, 2009.  She stated that her falls in January 2005 that she had previously claimed were accidental tripping were, in fact, falls related to her MS.  Claimant stated that at the time, she had been "embarrassed," and did not want

to inform Dr. Griffin about them. (Tr. 48.) Claimant also testified that a "droopy" left foot, symptomatic to MS, was the predominant cause of her falls. (Tr. 55.) Claimant recalled that in 2005, it took her as many as 15 minutes to vacuum the living room of a single-wide trailer, because she had to grab a chair repeatedly for balance. (Tr. 54-55.) Claimant also described her excessive fatigue due to Avonex (Tr. 56), and described how her face would swell when exposed to heat. (Tr. 54.)

### Summary of the ALJ's Findings

As required, the ALJ engaged in the five-step "sequential evaluation" process when she evaluated Claimant's disability. *See* 20 C.F.R. § 416.1520(a); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). As a preliminary matter, the ALJ found that Claimant last met the Social Security Act's insured status requirements on September 30, 2005. Further discussion of Claimant's disabled status, therefore, is confined to the period of time between her alleged onset date (October 1, 2004) and her date last insured.

I.    Steps One and Two

At Step One, the ALJ concluded that Claimant had not engaged in any substantial gainful activity since her alleged onset date. (Tr. 22.) At Step Two, the ALJ determined that Claimant had the following severe impairments: multiple sclerosis and obesity. (Tr. 22.) This finding was based on the fact that these conditions were diagnosed by "an acceptable medical source" and caused "more than a minimal effect" on Claimant's ability to work. (Tr. 22.) The ALJ also determined that Claimant's depression, while medically determinable, was nonsevere. (Tr. 22.)

II.    Step Three

At Step Three, the ALJ determined that Claimant's impairments did not meet or medically

equal a listing set forth in the regulations, specifically Listing 11.09, MS.  The ALJ found that Claimant did not have "sustained disorganization of gait or of fine or gross motor skills," or "significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity."  (Tr. 24.)  The ALJ further found no documented "cognitive involvement" through Claimant's date last insured.  The ALJ discounted Claimant's vision problems as "normal aging."

III.  <u>Claimant's Residual Functional Capacity ("RFC")</u>

The ALJ concluded that Claimant has the RFC "to perform light work" with the following limitations: "ability to alternate between sitting and standing at-will; one to three step tasks due to fatigue; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs; and no work around hazards or heights."  (Tr. 24.)  In determining Claimant's RFC, the ALJ must follow a two-step process to evaluate Claimant's symptoms.  First, the ALJ must determine whether an underlying medically determinable physical or mental impairment can reasonably be expected to cause those symptoms.  Second, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms to determine how they limit Claimant's ability to work.  (Tr. 24.)

*A. Underlying Causes*

Claimant alleged problems with dizziness, difficulty handling things, difficulty climbing stairs, blurry vision, skin reactions to sun exposure, fatigue from heat, difficulty with exertion, balancing activities, and general fatigue.  Claimant stated she required daily naps, and suffered from two-to-three days of flu-like symptoms from her Avonex injections.  Claimant also alleged cognitive deficits, including memory and concentration problems, and difficulty reading.  (Tr. 24-25.)  After considering the evidence, the ALJ found Ms. Newton's medically determinable impairments could reasonably be expected to cause the above symptoms.

*B. Limitations*

To determine the effective limitations Claimant's symptoms placed on her ability to work, the ALJ examined the objective medical evidence, including medical records from Claimant's treatment with Drs. Griffin and Schaben.  (Tr. 24.)  The ALJ also evaluated the credibility of corroborative statements, such as those doctors' signed statements regarding Claimant's ability to work, Claimant's own statements about her symptoms, and the opinions of disability determination experts retained by the Social Security Administration.  (Tr. 24-25.)

After examining Claimant's medical records, the ALJ determined that Claimant was limited by her impairments, but not disabled.  (Tr. 25.)  The ALJ also found that Claimant's "more pronounced limitations from MS" developed after Claimant's date last insured.  (Tr. 26.)  Though the ALJ did not make an explicit finding with respect to Dr. Griffin's signed evaluation of Claimant's work capabilities, the ALJ generally disregarded the statement, finding it inconsistent with the record evidence and based solely on Claimant's subjective reports.  (Tr. 28.)  Similarly, the ALJ gave no weight to Dr. Schaben's statement, noting that Dr. Schaben only began treating Claimant nearly two years[5] after Claimant's date last insured, and further finding that the doctor's assessment pertained to Claimant's condition in 2009 and was sharply contradicted by the treating records.  (Tr. 28.)  The ALJ also gave no weight to a statement from Physician's Assistant Brice Stanley, who treated Claimant for a head injury in 2009.  (Tr. 28.)

The ALJ also found Claimant's credibility to be undermined by her activities and "inconsistencies between her allegations of disabling symptoms and record evidence" that showed

---

[5] Nineteen months, to be precise.  Claimant's insured status expired on September 30, 2005. She began treatment with Dr. Schaben on May 25, 2007.

those symptoms were more "mild and fleeting."  In support, the ALJ cited differences between Claimant's testimony at her hearing and Dr. Griffin's notes about the affect of Avonex injections. (Tr. 27.)  Additionally, the ALJ discounted a statement Claimant provided in July 2007 regarding her functional capacity, finding that Claimant was describing her limitations at the time she applied for benefits, rather than when she was insured.  (Tr. 27.)  For evidence that Claimant's limitations were less than debilitating, the ALJ pointed to Claimant's attempts to return to work during her alleged period of disability.  (Tr. 27.)  Finally, the ALJ found two statements submitted by Claimant's husband – the first in June 2007, the second in October 2009 – not credible, citing that the record evidence did not reflect that Claimant was having "significant cognitive problems" prior to September 30, 2005.  (Tr. 27.)

The ALJ did give some weight to the opinion of the reviewing state agency physicians, Drs. Neal Berner ("Dr. Berner") and Sharon Eder ("Dr. Eder"), who found that Claimant could perform light work.  The ALJ noted that this was "consistent with the evidence." (Tr. 28.)  Accordingly, the ALJ found that Claimant's testimony and that of her treating physicians was "not credible" as it concerned "the intensity, persistence and limiting effects" of Claimant's MS symptoms.  (Tr. 25.) Claimant was limited, but not disabled by her impairments, permitting the finding of an RFC allowing for light work with certain restrictions.  (Tr. 27-28.)

## IV.  Step Four

At Step Four, the ALJ concluded that Claimant could not perform past relevant work as a machine operator specialist.  Claimant's limitation to light work only precluded her ability to perform her past work, which was medium work.  (Tr. 29.)

V.    Step Five

At Step Five, the ALJ concluded that Claimant was capable of performing other work that exists in substantial numbers in the national economy.  However, the ALJ also concluded that Claimant's limitations precluded her from performing the full range of light work.  In response to the ALJ's hypothetical, the Vocational Expert ("VE") testified that Claimant was capable of working as a table worker/assembler, hand stuffer, and basket filler.  (Tr. 30.)  All of these jobs exist in substantial numbers both regionally and nationally.

*Discussion*

Claimant objects to the ALJ's conclusions on two grounds: (1) the ALJ improperly rejected the opinions of Claimant's treating physicians without providing specific and legitimate reasons for doing so, and (2) the ALJ failed to provide clear and convincing reasons for finding Claimant not credible.  The court will address each objection in turn.

I.    Claimant's Treating Physicians

The ALJ is the "final arbiter" of ambiguities in medical evidence.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008).  When determining the proper weight to give a doctor's opinion, the ALJ should examine several factors, including the length of the treatment relationship, the frequency of examination, evidence that supports the doctor's opinion, the consistency of the doctor's opinion with the record as a whole, and the doctor's relevant area of specialty.  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)).  Thus, as a general rule, "the opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant."  *Id.* at 632 (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).  Accordingly, "even if the treating doctor's opinion is contradicted by another doctor, the ALJ may

not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record." *Id.* (internal quotation marks omitted).

"Specific and legitimate reasons" can include a treating physician's reliance on the claimant's discredited subjective complaints or inconsistency between the physician's opinion and the objective medical records. *See Tommasetti*, 533 F.3d at 1041. "Substantial evidence" is such evidence as a reasonable mind might require to support a conclusion: more than a scintilla but less than a preponderance. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.3d 573, 576 (9th Cir. 1988)). Thus, the ALJ's rationale for disregarding a treating physician's opinion – no matter how specific – must meet certain evidentiary standards for reasonableness. For example, "the opinion of a non-examining physician[6] alone cannot constitute substantial evidence to justify disregarding a treating physician's opinion." *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995). The ALJ must have some corroborating basis, whether from medical records or otherwise, that sways the weight of the evidence against the treating physician's opinion. *Id.*

*A. Dr. Griffin*

In her decision, the ALJ gave little weight to Dr. Griffin's opinions regarding Claimant's ability to work, despite two key facts: first, Dr. Griffin was Claimant's treating neurologist at the time Claimant alleges she was disabled; second, Dr. Griffin's opinions were formed and recorded during that same time. Instead, the ALJ made the following findings based on her interpretation of the record: (1) Claimant did not have significant problems with balance, (2) symptoms from

---

[6] A non-examining physician is a physician who neither examines nor treats the claimant. *Lester*, 81 F.3d at 830. Here, such a definition would apply to Drs. Berner and Eder, the state agency reviewing physicians.

Claimant's Avonex injections resolved relatively quickly, (3) Claimant was able to live a normally active week, (4) Claimant's records did not document fatigue with exertion prior to May 2007, and (5) Dr. Griffin's suggestion to avoid heat was not based on actual problems Claimant was experiencing at the time. (Tr. 28.) The ALJ then contrasted Dr. Griffin's opinion with that of the State agency physicians, Drs. Berner and Eder, finding their conclusion that Claimant could perform light work consistent with the record. (Tr. 28.)

### 1. Balance Problems

While the ALJ's reasons for rejecting Dr. Griffin's opinion are certainly specific, they do not meet the *Valentine* "substantial evidence" standard. In her decision, the ALJ asserted that "[t]he records do not document that [Claimant] had significant difficulties with imbalance during the relevant period." (Tr. 28.) As Claimant's counsel correctly notes, the ALJ directly cites no record evidence to support this assertion. (Pl.'s Opening Br. at 6.) However, the ALJ does extensively analyze the record when examining Claimant's credibility, discussed below, and appears to use the same rationalization to give Dr. Griffin's opinion little weight. In doing so, however, the ALJ improperly conflates Claimant's personal credibility with Dr. Griffin's objective medical record. That record does, in fact, conclusively document Claimant's significant difficulties with imbalance during the relevant period.

Upon reading Claimant's first MRI on November 23, 2004, Dr. Griffin relied on one of Claimant's prior episodes of gait instability – difficulty climbing stairs – to diagnose MS. (Tr. 291.) That diagnosis, which was thus at least partially based on Dr. Griffin's assessment of Claimant's gait instability, was factually correct and is undisputed in this case. On January 25, 2005, Claimant informed Dr. Griffin that she had been tripping on stairs at her home. (Tr. 279) In response, Dr.

Griffin noted Claimant's "ongoing gait instability." (Tr. 281.) On March 10, 2005, Claimant told Dr. Charnecki that she had been twisting her ankle regularly (Tr. 243), and on April 26, 2005, Claimant reported that she had fallen on at least two different occasions.[7] (Tr. 272.) Though Claimant denied that MS-related symptoms were the cause of her falls, Dr. Griffin, a neurology specialist with the benefit of actually seeing and evaluating the patient, noted gait instability in his impression from that appointment. (Tr. 274.) Indeed, all Claimant's records at Northstar Neurology from April 26, 2005, to the present day all include the notation "Gait Instability 4/05." Given the stark contrast between Claimant's reports of "accidental" tripping, stumbling, and falling and how Dr. Griffin interpreted those same incidents – as MS-related gait instability – the ALJ's conclusion that Dr. Griffin's opinions were somehow "based on [Claimant's] subjective reports"[8] is without an adequate evidentiary basis.

### 2. Avonex, Fatigue, and Normal Weeks

With respect to Claimant's Avonex symptoms, these too are documented in the record. On January 25, 2005, Dr. Griffin noted Claimant's complaints about flu-like symptoms from her Avonex injections. (Tr. 279.) These symptoms were similarly noted by Dr. Charnecki, Claimant's primary care physician, on March 10, 2005. (Tr. 243.) It is true that, throughout his reports, Dr. Griffin notes that Claimant was tolerating Avonex relatively well and that her condition was improving. (Tr. 279, 272.) As they relate to MS, however, improvement and toleration are relative

---

[7] Though the court will discuss this incident at greater length in this opinion's section on Claimant's credibility, *infra*, it bears mentioning here that the incidents Claimant described on April 26, 2005, were falls where Claimant "actually ended up on the floor," according to the definition endorsed by the ALJ. (Tr. 49.)

[8] Tr. 28.

terms, and the record reflects that Claimant repeatedly complained about Avonex side effects. Indeed, Dr. Griffin offered Claimant alternative drugs as early as April 26, 2005. (Tr. 274.) On June 9, 2005, Claimant went to Dr. Charnecki complaining of flu symptoms that bear a striking resemblance to symptoms Dr. Griffin acknowledged were caused by Avonex. (Tr. 242.) After ceasing treatment with Dr. Griffin, Claimant discontinued use of Avonex. (Tr. 252.) With that in mind, much of the ALJ's analysis appears to hinge on Dr. Griffin's comments from April 26, 2005, which she uses as the basis for her finding that, despite the symptoms, Claimant was able to live a "normally active week." (Tr. 28.)

For clarification, Dr. Griffin's April 26, 2005, report states that Claimant's injection-related fatigue was prominent "following the injection, improving over the next day or two," but that as the week progressed and Claimant was active, by "the end of the week she is also more fatigued." (Tr. 271.) Reading Dr. Griffin's words exactly as they are recorded leads to the conclusion that Claimant suffered prominent fatigue the day of her Avonex injection and for one-to-two days afterward. By the end of that same week, after engaging in a few days of normal activities, Claimant was again more fatigued. Assuming a seven day week, Claimant therefore had, at most, three-to-four days per week without Avonex-related fatigue.[9] Three-to-four days is, by definition, not a full work week.

The ALJ attempted to separate Claimant's injection-related fatigue from exertional fatigue, asserting that Claimant's records do not show exertional fatigue until May 2007. (Tr. 28.) This distinction is not relevant, because whether Claimant was fatigued by her injections or fatigued by

---

[9] Claimant did not seek help administering Avonex shots until early 2006, so during the relevant time frame, she was administering the shots herself. (Tr. 382.) Accordingly, Claimant certainly could have administered the shot on weekends. However, given the restrictive timeline and the fact that full-time work is the standard under the Social Security Act, this issue does not substantively change the court's analysis.

FINDINGS AND RECOMMENDATION    18                           {TPW}

exertion, the fact remains that Claimant was still fatigued.  Coupled with Claimant's testimony about her activities of daily living, discussed below, the ALJ's finding that Claimant was normally active through a full week falls short of evidentiary standards to support her conclusion.

### 3. Avoidance of Heat

The ALJ's final finding with respect to Dr. Griffin's opinion was that his recommendation to avoid a heated environment was not supported by the record evidence.  As evidence, the ALJ claimed that Claimant "had not complained of significant problems from heat exposure prior to her date last insured."  (Tr. 28.)  This latter statement is not factually accurate.  At her June 9, 2005, appointment with Dr. Charnecki, Claimant specifically complained that she was "overheated," though the record admittedly does not specify the alleged cause.  (Tr. 242.)

But even without her oversight of Claimant's June 9, 2005 statement, the ALJ's rationale is contrary to the record.  Drs. Griffin and Schaben, neurologists involved in the treatment and care of MS patients, both recognize heat as a factor that exacerbates MS-related symptoms.  (Tr. 275, 393.)  Since the expiration of her insured status, Claimant has had numerous, well-documented problems with heat exposure. (Tr. 60, 361, 364.)  Accordingly, Dr. Griffin recommended on April 26, 2005, that Claimant avoid heated environments when looking for work.  (Tr. 275.)  Claimant need not ignore her treating physician's advice and expose herself to heat simply to prove that heat would aggravate her symptoms.

Because the ALJ's reasons for rejecting Dr. Griffin's opinion were not specific, legitimate, and supported by substantial evidence in the record, the ALJ was incorrect to disregard the April 26, 2005, Vocational Rehabilitation Form (Tr. 368).  Based as they were not on any subjective, unproven complaints, but on the established medical record, Dr. Griffin's opinions should be given significant

weight.

 B. Dr. Schaben

The ALJ gave no weight to the opinion of Dr. Schaben, who first began treating Claimant on May 25, 2007. Dr. Schaben's opinion, submitted on or near the day of Claimant's 2009 administrative hearing, laid out an extensive list of Claimant's impairments as of 2009, and stated that it would be reasonable to conclude Claimant was similarly limited in 2005. The ALJ, however, found that Dr. Schaben's assessment pertained only to Claimant's current condition, rather than her condition prior to her date last insured. (Tr. 28.) Furthermore, the ALJ found that because Claimant's MS had progressed slowly over the years, Claimant's condition in 2005 was not as severe as it was at the time of the hearing. Thus, Dr. Schaben's opinion that Claimant was as limited in 2005 as she was in 2009 was "sharply contradicted by the treating records." (Tr. 28.)

An ALJ may disregard a treating physician's opinion that is conclusory and unsupported by objective medical findings. *See* 20 C.F.R. § 404.1527(d)(3); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Moreover, it is reasonable for an ALJ to reject medical evidence outside a decision's relevant time period if that evidence is not offered as a retrospective analysis of the claimant's impairments during that relative time period. *Capobres v. Astrue*, 2011 WL 1114256, *5 (D. Id. March 25, 2011). However, "medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of a pre-expiration condition." *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988).

This court disagrees that Dr. Schaben's opinion is "sharply contradicted" by the medical records prior to Claimant's date last insured. As explained in the analysis of Dr. Griffin's opinion, *supra*, Claimant had documented fatigue, balance problems, and sensitivity to heat prior to her date

last insured.  As will be discussed further in the following section dealing directly with Claimant's credibility, Claimant also had significant cognitive issues and insomnia in that same timeframe. Furthermore, although, as the ALJ points out, an opthamologist credited Claimant's vision problems to "normal aging," Dr. Schaben's description of oscillopsia[10] corroborates many of Claimant's complaints about blurry vision and focusing.  True, Claimant's symptoms have likely worsened since 2005, but the functional limitations proposed by Dr. Schaben, *supra*, closely resemble those recommended by Dr. Griffin and the State's vocational rehabilitation reviewer in April and June 2005.  (Tr. 367, 368.)

The ALJ correctly questioned Dr. Schaben's statement with skepticism, coming as it did in a "checklist" form prepared by Claimant's counsel.  *See Batson* 359 F.3d at 1195.  But it does not follow that the ALJ then would accord some weight to the opinions of Drs. Berner and Eder – non-treating, non-examining physicians who submitted similar "checklist" forms two years after Claimant's date last insured – while completely disregarding the opinion of Dr. Schaben, who reviewed Claimant's 2005 records before rendering her opinion and was a treating physician.  The ALJ cannot legitimately reject Dr. Schaben's opinion while simultaneously giving significant weight to a similar post-insurance expiration medical opinion that is based solely on a review of the records.

## II.    Claimant's Credibility

Because both Claimant's treating physician prior to the expiration of her insured status and Claimant's current treating physician have stated unequivocally that Claimant was limited to

---

[10] "Oscillepsia [sic] is eye movement abnormality which causes feelings of dizziness with any eye movement," and makes it "difficult to read, work on computer, [or] walk about a room because [of] dizziness with eye movements."  (Tr. 392.)  Claimant had previously complained, for example, of difficulty focusing while reading.  (Tr. 263.)

sedentary-level work prior to her date last insured, the ALJ should have found Claimant disabled. Indeed, the ALJ stated herself at the administrative hearing that "if [she] gave an RFC that was limited to sedentary work, the Claimant would be disabled by direct application of the good rule." (Tr. 63.)  This court agrees and now turns to discussing Claimant's credibility.

A claimant's credibility is a question of fact for the ALJ to decide.  *Parra v. Astrue*, 481 F.3d 742 (9th Cir. 2007).  However, the ALJ cannot arbitrarily discredit a claimant's testimony; rather, the ALJ must provide specific findings regarding what testimony is not credible and why.  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).  To that end, the ALJ should evaluate a claimant's credibility using a two-step process.  *See Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986), *superseded by statute on other grounds as recognized by Bunnell v. Sullivan*, 912 F.2d 1149, 1154 (9th Cir. 1990).  First, the ALJ must determine whether the claimant has produced objective medical evidence of an impairment or impairments.  Second, the ALJ must determine whether the claimant has shown that the impairment or combination of impairments could reasonably be expected to produce the symptoms claimed.  *Id.*  "Once a claimant meets the *Cotton* test and there is no affirmative evidence suggesting she is malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so."  *Smolen v. Chater*, 80 F.3d 1273, 1283-1284 (9th Cir. 1996.)

Here, the ALJ found that Claimant met the first part of the *Cotton* test, but not the second. (Tr. 25.)  Specifically, the ALJ found Claimant not credible with respect to Claimant's dizziness, difficulty handling objects, blurry vision, heat exposure, fatigue, balance problems, Avonex-related symptoms, and cognitive difficulties.  (Tr. 24-25.)  While the ALJ admitted that Claimant's MS could reasonably be expected to cause those symptoms, the ALJ found that the record evidence

contradicted Claimant's assertions about the extent to which those symptoms were disabling. (Tr. 25.) This court disagrees with the ALJ's analysis, and finds that the ALJ failed to state clear, convincing, and reasonable reasons for finding Claimant not credible.[11]

*A. Activities*

According to the ALJ, Claimant's credibility "in general is undermined by her activities as well as by inconsistencies between her allegations of disabling symptoms and the record evidence." (Tr. 27.) With respect to activities, the ALJ puts significant emphasis on Claimant's efforts to enter the workplace prior to, and even after, Claimant's date last insured. (Tr. 27.) But the ALJ's reading of the record is selective at best. While Claimant initially continued to assist her husband with bookwork for his trucking business,[12] Mr. Newton noted in a statement given on October 2, 2009, that

> Shortly after she was diagnosed, Madeline was having a lot of problems with the jobs. She wouldn't get her numbers right. She would forget things I told her. She would log things incorrectly. She couldn't remember what to do if I'm [sic] was not there. . . .
> Her problems with the business and with doing the paperwork seemed to culminate in the beginning of 2005. You are supposed to send your logs in quarterly. Well in 2005 Madeline did all the totals for one month and sent that in without the other two months. It ended up in a really big mess and I was audited in 2006.

(Tr. 206.) The ALJ gave Mr. Newton's statement no weight, finding that "the record evidence does

---

[11] The parties dispute the applicable standard the ALJ must meet with respect to Claimant's credibility. Claimant suggests that the *Smolen* "clear and convincing" standard controls, while the Commissioner refers the court to SSR 96-7p *available at* 1996 WL 374186, *2, which utilizes a lower standard of "reasonableness." To the extent the standards are in conflict, the issue is not dispositive: in this case, the ALJ's finding that Claimant was not credible is neither clear, convincing, nor reasonable.

[12] The court notes that Claimant's husband was a self-employed independent contractor, managing and driving only one truck, and Claimant's assistance was sporadic at best: four hours per day, twice a month. (Tr. 206.)

not reflect that Ms. Newton was having significant cognitive problems prior to the expiration of her insured status." (Tr. 27.) This finding is contradicted by the record. On January 25, 2005, Dr. Griffin noted in his records that Claimant had been doing finances for her husband's business, but that recently, "*she has not been competent* in her ability to do this accurately." (Tr. 279) (emphasis added). Mr. Newton's statement with respect to his wife's cognitive abilities in early 2005 is directly supported by Dr. Griffin's medical records and should have been accorded at least some weight.

The ALJ also pointed to Ms. Newton's post-date last insured enrollment at tax preparation school and short-term employment at H&R Block as evidence that her allegations of cognitive impairment. (Tr. 27.) However, according to Claimant, she did this against the advice of her doctor, who told Claimant that her memory problems would prevent her from being successful. (Tr. 205.) Indeed, Claimant failed her tax preparation exam (Tr. 264), and had to end her employment prematurely due to her health issues. (Tr. 125.) As the Ninth Circuit said in *Reddick*, 157 F.3d at 722, "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." Here, there is no evidence here that Claimant was doing anything other than attempting, and ultimately failing, to lead a normal life. Indeed, her repeated inability to find suitable work merely indicates that her symptoms were worse – not better – than she was willing to admit at that time.

*B. Inconsistencies*

In determining that Claimant's statements were not credible, the ALJ also pointed to alleged inconsistencies between Claimant's testimony and the objective medical record. (Tr. 27.) As this court has already noted, however, the ALJ's interpretation of that record was not supported by substantial evidence. Therefore, this court's analysis of these "inconsistencies" necessarily differs

from the ALJ's.  According to the State medical reviewer who assessed Claimant on June 1, 2005, Claimant's MS is a "[p]rogressive disease [with] remissions & exacerbations expected." (Tr. 367.) Accordingly, a degree of variation should be expected in the severity of Claimant's symptoms from day-to-day and appointment to appointment.  Indeed, the Social Security Administration's own regulations specifically account for a lack of consistency in a claimant's symptom testimony:

> "The lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible.  Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms."

SSR 96-7p, *available at* 1996 WL 374186, *5.

This approach explains many of the inconsistencies mentioned in the ALJ's opinion, such as how Claimant's gait instability could be "not impairing function or leading to falls," (Tr. 259) only months after Claimant suffered continued episodes of gait instability, blurred vision, and insomnia.  (Tr. 261-264.)  Indeed, on May 1, 2006, Dr. Griffin expressly noted in his record that Claimant's imbalance was "better some days than others." (Tr. 259.)  The ALJ was incorrect to view Claimant's varying symptom intensity as incredible.

However, the court would like to directly address some of the specific inconsistencies mentioned in the ALJ's opinion, beginning with the ALJ's previously mentioned distinction between "tripping" and "falling." (Tr. 49.)  According to a definition proposed by Claimant's counsel and accepted by the ALJ, "falling" only occurs with the claimant "end[s] up on the floor."  The ALJ subsequently noted that while Claimant had tripped many times, she had never fallen. (Tr. 49.)  In fact, the record reflects that Claimant did, in fact, fall on multiple occasions and, in the context of

a diagnosis of gait instability, such a distinction is irrelevant.  Tripping, stumbling, and falling –

regardless of result – are each indicative of an unstable gait, which is likely why Dr. Griffin ignored

Claimant's explanations of "accidental tripping" and noted instead gait instability on April 26, 2005.

(Tr. 272, 274, 368.)  It also explains the discrepancy between Claimant's occasional stumbles and

regular twisted ankles.  (Tr. 243.)

In confirmation of this theory, Claimant testified at her administrative hearing that her trips

and falls were, in fact, MS-related, and that she had been dishonest about her symptoms with Dr.

Griffin because she was embarrassed.  (Tr. 48.)  Her explanation is consistent with the record.  The

ALJ also failed to discuss other hearing testimony similarly consistent with the objective record.  For

example, Claimant testified that it took her 15 minutes to vacuum the living room of a single-wide

trailer, and that she would have to stop repeatedly to grab a chair for balance.  Claimant specifically

testified that this took place during 2005.  (Tr. 55.)  Claimant's testimony regarding her Avonex

symptoms[13] is also largely consistent with the record and should have been credited as well.

Finally, the court notes the ALJ's incomplete reading of the record: the ALJ's statement that,

"[a]s of April 2006, in fact, Ms. Newton denied having excessive fatigue."  (Tr. 28.)  Presumably,

the ALJ draws this inference from the second page of Dr. Griffin's notes from Claimant's April 10,

2006, appointment, where he noted that Claimant "denies trouble falling asleep, excessive fatigue."

(Tr. 262.)  That notation is quite clearly a record-keeping error, because Dr. Griffin's notes contain

detailed descriptions of Claimant's primary complaint at that appointment:  insomnia.  Specifically,

Claimant complained that the medication Dr. Griffin had prescribed to treat Claimant's insomnia

---

[13] "I was on it for almost two years and probably three to four days a week I was sick.  Just like having the flue.  It would start right after I get [sic] my shot and then it would ease up and then it was time to take a shot again."  (Tr. 56.)

was not working effectively.  (Tr. 261, 263.)  As a result, Claimant was sleeping only approximately *two hours per night*.  (Tr. 264.)  Accordingly, Dr. Griffin changed Claimant's prescription.  Given the overwhelming contextual weight of the remainder of Dr. Griffin's notes, the ALJ should have concluded that Claimant was having trouble falling asleep and suffering from excessive fatigue.

III.    Remand

Claimant requests that the court remand this decision for an award of benefits, or alternatively, to remand for additional proceedings.  "The decision whether to remand a case for additional evidence, or simply to award benefits is within the discretion of the court."  *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  In *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004), the Ninth Circuit set forth the framework for determining whether a remand for hearing or a remand for benefits is appropriate:

> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful.  Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits.

*Id*. at 594 (citations and emphasis omitted).  Evidence rejected by the ALJ should be credited and remand for benefits granted where:  "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited."  *Id.* (citing *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).

This case should be remanded for an award of benefits.  First, the court sees no benefit to be gained from enhancement of the record.  Claimant has already produced all relevant medical records

between her alleged onset date and her date last insured, and subsequent treating records would be of limited value since Claimant's current condition is not under consideration. Second, as discussed *supra*, the ALJ rejected the testimony of both Claimant and her treating physicians without giving legally sufficient reasons. The ALJ also made findings that were unsupported by the record. As a result, the court must credit the evidence rejected by the ALJ and, having done so, finds Claimant was limited to sedentary-level work during the time of her alleged disability. Third, as the ALJ herself stated during the administrative hearing, "if I gave an RFC that was limited to sedentary work, the Claimant would be disabled by direct application of the good rule." (Tr. 63.) Accordingly, this court should find Claimant disabled, and remand for an award of benefits.

## Conclusion

For the forgoing reasons, the Commissioner's decision denying Claimant's application for DIB should be reversed and remanded for an award of benefits.

## Scheduling Order

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due September 20, 2012. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 6th day of September, 2012.

_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge

FINDINGS AND RECOMMENDATION          28                              {TPW}